UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

DONNA M. HILLER,         :     CIVIL NO. **1:06-0557**
                         :
          Plaintiff   :
                         :
     v.               :     (Judge Caldwell)
                         :
JO ANNE B. BARNHART,     :     (Magistrate Judge Smyser)
Commissioner of Social    :
Security,             :
          Defendant  :
                         :

## REPORT AND RECOMMENDATION

The plaintiff has brought this action under the authority of 42 U.S.C. § 405(g). She seeks to obtain judicial review of the decision of the Commissioner of Social Security denying her claim for disability insurance benefits.

## I.  Procedural Background

The plaintiff applied for benefits on October 21, 2003. She alleged that she had been disabled since January 15, 2003. (Tr. 62-64, 76). She alleged disability due to chronic depression, back problems, hepatitis C, and fibromyalgia. (Tr. 80). The plaintiff's application was denied initially and she filed a request for a hearing. (Tr. 44-51).

On October 3, 2005, the plaintiff, who was represented by

counsel, and a vocational expert testified before an

Administrative Law Judge (ALJ).  (Tr. 23-43).  In a decision

dated October 11, 2005, the ALJ found the plaintiff not disabled.

(Tr. 10-20).  The Appeals Council denied the plaintiff's request

for review, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 5-9).  42 U.S.C. § 405(g).  The plaintiff

then commenced this action for judicial review of the

Commissioner's final decision.  (Doc. 1).


## II.   Factual Background

The plaintiff alleged disability since January 15, 2003 due

to chronic depression, back problems, hepatitis C, and

fibromyalgia.[1]  (Tr. 72).


Prior to her alleged onset date, the plaintiff tried to

commit suicide three times.  In June 1998, at age thirty-one,

while pregnant, she shot herself in the mouth and sustained a

soft tissue injury to her posterior right pharnyx.  (Tr. 128-48).

The plaintiff's blood alcohol level is reported to have been .91%

---

[1]    The plaintiff alleged disability due to both mental and physical
impairments, but because the plaintiff's brief focuses on her alleged mental
impairment, we will tailor our discussion of the facts accordingly.  (Doc. 5 at
7-13).

at the time.  She reported that she had been feeling extremely
depressed since her family physician had discontinued, due to her
pregnancy, the anti-depressant medication she had been taking for
the previous two years.  (Tr. 147).  After one week of
psychiatric care, she exhibited a subclinical risk for suicide
and minimum degree of depression, and was discharged.  (Tr. 145-
46).  The plaintiff did not thereafter pursue outpatient mental
health treatment.  (Tr. 189).

In October 2001, the plaintiff had another suicidal episode.
(Tr. 188-89).  She was involuntarily admitted to the hospital by
her sister-in-law, who alleged that she had "started back on
heroin and other drugs" and had threatened to commit suicide.
(Tr. 189).  The plaintiff reported that her husband was
physically and verbally abusive and accused her of being a heroin
addict.  *Id*.  She admitted that she had been thinking about
suicide and did not want to live anymore.  *Id*.  The plaintiff was
treated for three days, and had an "excellent response" to
medication.  (Tr. 188).  By the time she was released, the
plaintiff's physician noted that her affect was good and that she
smiled spontaneously and denied suicidal ideations.  *Id*.

The plaintiff's third suicide attempt occurred in May 2002, when she overdosed on heroin. (Tr. 196-204). She told attending physicians that she was depressed following the recent death of her husband and had accidentally overdosed. (Tr. 198). She stated that she had not intended to kill herself and she related a longstanding history of drug use and depression.[2] *Id.* During her three-day hospitalization, her doctor noted that she was pleasant and cooperative and that she denied feeling depressed or suicidal. *Id.*

From May 2002 to September 2002, and again from February 2003 through October 2003, the plaintiff was incarcerated at the Lackawanna County Prison. (Tr. 214-83). At her May 2002 intake assessment, she stated that she used one-half to one bag of heroin three times a week and smoked one pack of cigarettes per day. (Tr. 230, 272).

While she was in jail, the plaintiff attended four counseling sessions at Scranton Counseling Center. (Tr. 208-09). At every session, she denied having suicidal or homicidal

---

[2] At the October 3, 2005 hearing, the plaintiff testified that she had used heroin only once, in an attempt to commit suicide. (Tr. 34-35).

ideations.  *Id.*  In February 2003, she reported that she was depressed, anxious, and had crying spells.  (Tr. 209).  At that time, she was prescribed Prozac.  *Id.*  The following month, the plaintiff was cooperative and her depression was described as "fair."  *Id.*  In June 2003, a counselor reported that the plaintiff was "doing well" and her depression was "much improved."  (Tr. 208).  In August 2003, the plaintiff was calm and cooperative and the examiner noted that she was "doing excellent" and that her depression and anxiety were improving.  *Id.*

In January 2003, the plaintiff began treatment with Rajan Mulloth, M.D., who monitored her depression and anxiety, in addition to her various physical complaints.  (Tr. 323-33, 375-420).  The plaintiff told Dr. Mulloth that she obtained medication for her depression through the Scranton Counseling Center.  (Tr. 331).  Dr. Mulloth prescribed Oxycontin for her chronic pain.  (Tr. 330).  In February 2003, the plaintiff reported significant improvement in her pain symptoms.  (Tr. 328-30).  She stated that she was functionally able to do more.  (Tr. 328).  Dr. Mulloth observed that she appeared "much less depressed and seemed much more cheerful."  *Id.*

The plaintiff did not return to Dr. Mulloth until October 2003, after she was released from jail.  (Tr. 326-27).  She told Dr. Mulloth that she had been in North Carolina for several months and had stopped taking all of her medication.  (Tr. 326). The plaintiff's main complaint was chronic pain, although she stated she was depressed over her recent weight gain.  *Id*.  Dr. Mulloth again prescribed Oxycontin.  *Id*.  The following month, the plaintiff informed Dr. Mulloth that she had spent the past nine months in jail for child abuse.  She denied culpability. (Tr. 325).  She also disclosed that she had used her Oxycontin prescription a few days prior to its scheduled refill.  *Id*.  He cautioned her to take medication only as prescribed.  *Id*.  In December 2003, the plaintiff presented no depression-related complaints to Dr. Mulloth.  *Id*.

The plaintiff did not visit Dr. Mulloth again until six months later.  She then returned to Dr. Mulloth for follow-up visits from June 2004 through July 2005.  (Tr. 375-420).  During this eleventh-month period, the plaintiff presented complaints of increased anxiety on one occasion, in August 2004.  (Tr. 411-14).

6

At this visit, Dr. Mulloth recommended that she consult her
psychiatrist about changing her medications.  (Tr. 413).

     At the other six office visits over this period, in June
2004, October 2004, November 2004, January 2005, February 2005,
and June 2005, the plaintiff presented no complaints about
depression or anxiety.  (Tr. 383-85, 392-98, 402-10, 417-20).  At
every examination she denied depression, anxiety, memory loss,
suicidal ideation, hallucinations, paranoia, phobia and
confusion.  *Id.*  Dr. Mulloth consistently noted that she appeared
oriented to all spheres and had an appropriate affect and mood.
*Id*.  He also regularly described her depressive disorder as
"stable."  *Id*.  At the January, February, and June 2005
examinations, the plaintiff specifically reported "no feelings of
down [in] the dumps" and presented no depression-related
complaints.  (Tr. 383-85, 392-98).  She told Dr. Mulloth that she
had a good energy level and a good appetite, and that she was
sleeping well.  *Id*.

     In July 2005, Dr. Mulloth reported that he would no longer
prescribe Oxycontin after a urine screen was positive for
morphine, a finding which he attributed to possible heroin use.

7

(Tr. 376).  He terminated his relationship with the plaintiff later that month.  (Tr. 375).

On March 3, 2004, the plaintiff attended a psychiatric consultative examination with Ali Nourian, M.D., at the request of the Pennsylvania Bureau of Disability Determination.  (Tr. 344-49).  With regard to her mental illness, the plaintiff reported that she had been under the care of a local psychiatrist at the Scranton Counseling Center off and on since 1997.  (Tr. 344).  She stated that she was depressed, fatigued, unable to concentrate, cried a lot, and had problems sleeping.  *Id.*  The plaintiff also stated that she did not socialize and slept most of the day.  (Tr. 346).  She stated that she was able to cook but she sometimes stayed in bed all day because of fibromyalgia.  *Id*. She stated that when she was working she had no difficulty getting along with co-workers or supervisors at her various jobs. *Id.*  She disclosed a history of legal problems, including her two recent convictions for violating probation and for assaulting her teenage daughter.  *Id.*

Dr. Nourian observed that the plaintiff appeared older than her age and had satisfactory personal hygiene. (Tr. 345).  He

8

noted that she had a depressed mood and was tearful during the interview; she also appeared to be preoccupied with her psycho-social and physical problems. *Id.* The plaintiff denied suicidal ideations, and Dr. Nourian noted no perceptual disturbances or delusional ideas. *Id.* In his opinion, she had an appropriate affect, average intelligence, fair concentration, adequate memory, adequate impulse control, and adequate social and test judgment. *Id.* Dr. Nourian diagnosed major depression, recurrent. *Id.* Dr. Nourian concluded that she could manage her personal funds but opined that she had limited ability to perform physical activities. (Tr. 346).

Based on the plaintiff's statements, Dr. Nourian concluded that she had limitations with respect to concentration and task persistence and that she had a very limited ability to deal with stress. *Id.* With regard to specific work-related activities, Dr. Nourian concluded, the plaintiff had "marked" limitations in responding appropriately to work pressures in a usual work setting and to changes in a routine work setting and "moderate" limitations with regard to understanding, remembering and carrying out detailed instructions and making judgments on simple work-related decisions. (Tr. 348). In his opinion, she had only

9

"slight" limitations with respect to understanding, remembering and carrying out short, simple instructions and interacting appropriately with the public, supervisors and co-workers.  *Id.*

On March 26, 2004, John Grutkowski, Ph.D., a state agency psychologist who reviewed the plaintiff's medical records, concluded that she had depression and a history of opioid abuse which mildly limited her ability to perform activities of daily living and maintain social functioning; moderately limited her ability to maintain concentration, persistence or pace; and caused no episodes of decompensation.  (Tr. 354-67).  In an assessment of her mental work-related abilities, Dr. Grutkowski determined that the plaintiff had "marked" limitations in only one area, that of, carrying out detailed instructions.  (Tr. 350).  He found that she had "moderate" limitations with respect to: maintaining attention and concentration for extended periods; completing a normal workday and work-week without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work

10

setting; and, being aware of normal hazards and taking

appropriate precautions.  (Tr. 350-51).


III.  **Disability Determination Process**

The Commissioner has promulgated regulations creating a

five-step process to determine if a claimant is disabled.  The

ALJ must sequentially determine:  (1) whether the claimant is

engaged in substantial gainful activity; (2) whether the claimant

has a severe impairment; (3) whether the claimant's impairment

meets or equals a listed impairment; (4) whether the claimant's

impairment prevents her from doing past relevant work; and (5)

whether the claimant's impairment prevents her from doing any

other work.  20 C.F.R. § 404.1520.


Here, the ALJ determined that: (1) the plaintiff had not

engaged in substantial gainful activity since her alleged

disability onset date; (2) the plaintiff's depression, back pain,

fibromyalgia, and substance abuse disorder were severe

impairments; (3) but did not meet or medically equal any listed

impairment(s); (4) that the plaintiff was unable to perform her

past relevant work as a waitress, sewing machine operator, and

counter person; but (5) had the residual functional capacity to perform a full range of light unskilled work.  (Tr. 15-20).

Based upon a finding of a residual functional capacity to perform a full range of light unskilled work, the ALJ concluded that the plaintiff could make a successful adjustment to other work in the national economy, noting that Medical Vocational Rule 202.21 directs a finding of "not disabled" for a person with the plaintiff's vocational profile.  (Tr. 19-20).  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.21.

## IV.  Discussion

The plaintiff argues that the ALJ erred in: (1) finding that her depression did not meet or equal Listing 12.04; and (2) finding that she could make an adjustment to other work in the national economy.

### A.  Standard of Review

If the Commissioner's decision is supported by substantial evidence it must be affirmed. 42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Plummer v. Apfel*,

186 F.3d 422, 427 (3d Cir. 1999)(quoting *Ventura v. Shalala*, 55
F.3d 900, 901 (3d Cir. 1995).  Substantial evidence is more than
a mere scintilla of evidence but less than a preponderance.
*Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

A single piece of evidence is not substantial evidence if
the Commissioner ignores countervailing evidence or fails to
resolve a conflict created by the evidence.  *Mason v. Shalala*,
994 F.2d 1058, 1064 (3d Cir. 1993).  However, in an adequately
developed factual record, substantial evidence may be "something
less than the weight of the evidence, and the possibility of
drawing two inconsistent conclusions from the evidence does not
prevent [the decision] from being supported by substantial
evidence."  *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620
(1966).

To facilitate review of the Commissioner's decision under
the substantial evidence standard, the Commissioner's decision
must be accompanied by "a clear and satisfactory explication of
the basis on which it rests."  *Cotter v. Harris*, 642 F.2d 700,
704 (3d Cir. 1981).  Conflicts in the evidence must be resolved
and the Commissioner must indicate which evidence was accepted,

13

which evidence was rejected, and the reasons for rejecting certain evidence. *Id*. at 706-707.  In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole.  *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).


    B.  Whether the ALJ erred in finding that the plaintiff's depression did not meet or equal Listing 12.04

    The plaintiff contends that the ALJ erred in finding that her depression did not meet or equal Listing 12.04 (Affective Disorders). (Doc. 5 at 7-12).  The ALJ found that the plaintiff met Listing 12.04's threshold, or § A requirements, but did not meet the listing's § B requirements.  (Tr. 16).  Thus, the ALJ concluded, the plaintiff had not met the requirements of Listing 12.04.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04 (explaining that both §§ A and B must be met for a claimant to be disabled *per se* under Listing 12.04).[3]

    Section B of Listing 12.04 requires the plaintiff to show that her depression resulted in at least two of the following:

---

    [3] A claimant can also be found to be disabled *per se* under Listing 12.04 if she satisfies the listing's § C requirements.  20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04.  Because here the plaintiff did not argue that she met the more stringent § C requirements, of which the ALJ found she met none, we have omitted any related discussed.

> 1. Marked restriction of activities of daily living;
> 2. Marked difficulties in maintaining social functioning;
> 3. Marked difficulties in concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B).

The ALJ found that the plaintiff's depression only mildly limited her activities of daily living and social functioning; caused moderate difficulties in concentration, persistence, or pace; and resulted in no episodes of decompensation during the relevant period.  (Tr. 16).  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B).

A claimant bears the burden of producing evidence sufficient to establish disability and of proving that her condition meets all the criteria in a listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a). A claimant "is in a better position to provide information about [her] own medical condition."  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  Yet most of the evidence relating to the plaintiff's depression pre-dates her alleged disability onset date.

15

Substantial evidence appears to support the ALJ's
determination that the plaintiff's depression caused only mild
limitations in her daily activities and social functioning.  (Tr.
16).  The plaintiff testified that she lives with, and
independently cares for, her five year-old son.  (Tr. 16, 27).
She stated that she can perform light household cleaning, do
laundry, go grocery shopping, and cook.  (Tr. 16, 33, 98, 100,
346).  She has no difficulty taking care of her personal hygiene.
(Tr. 99, 344, 346).

Substantial evidence appears to support the ALJ's
determination that the plaintiff has moderate, not marked,
limitations on her ability to maintain concentration, persistence
or pace.  (Tr. 16).  As the ALJ noted, Dr. Nourian reported that
the plaintiff's concentration was "fair" and opined that she had
only "slight" limitations with respect to understanding,
remembering and carrying out short, simple instructions.  (Tr.
16, 345, 348).  The plaintiff, in her own disability paperwork,
admitted that she was able to concentrate on her work for
extended periods of time; she had no trouble understanding and

16

carrying out instructions; and she could make decisions on her
own.  (Tr. 101-02).

Substantial evidence may be seen to support the ALJ's
finding that the plaintiff experienced no repeated episodes of
decompensation during the relevant time period.  (Tr. 16).
Although the record showed that she had three in-patient
psychiatric hospitalizations, they occurred prior to her alleged
onset date of January 15, 2003.  *Id.*  She had no psychiatric
hospitalizations after May 2002.  None of her hospitalizations
lasted longer than one week.  (Tr. 128-48, 188-89, 196-204).  The
Commissioner's regulations define "repeated episodes of
decompensation, each of extended duration" as three episodes
within one year, or an average of once every four months, each
lasting for at least two weeks. 20 C.F.R. pt. 404, subpt. P, app.
1, § 12.00(C)(4).

No mental health expert who treated or examined the
plaintiff, or reviewed her medical records, has opined that her
depression was of listing-level severity.  Dr. Grutkowski, the
state agency psychologist, reviewed the record and determined
that her condition did not meet or equal any listed impairment.

17

(Tr. 346-47).  Dr. Grutkowski concluded that the plaintiff's
depression caused only mild limitations in her daily activities
and social functioning; moderate restrictions in concentration,
persistence or pace; and no episodes of decompensation.  (Tr.
364).  In addition, both Dr. Grutkowski and Dr. Nourian concluded
that the plaintiff retains the ability to perform mental work-
related activities, notwithstanding her severe mental impairment
and her past history of suicide attempts.  (Tr. 348, 350-51).

In addition, the record indicates that the plaintiff's
depression has improved over the relevant time period.  In June
2003 and August 2003, her counselor reported that her depression
was improving and that she was doing "excellent."  (Tr. 208).
From June 2004 through July 2005, the plaintiff presented
virtually no depression-related complaints to Dr. Mulloth, her
family physician.  (Tr. 375-420).  She consistently denied
suicidal or homicidal ideations and Dr. Mulloth regularly
characterized her depressive disorder as "stable."  (Tr. 383-85,
392-98, 402-10, 417-20).  The most recent treatment notes in the
record showed that the plaintiff reported "no feelings of down
[in] the dumps" and told Dr. Mulloth that she had a good energy

level and a good appetite, and that she was sleeping well.  (Tr. 383-85, 392-98).

The plaintiff bore the burden of proving her depression was of listing level severity.  *Zebley*, 493 U.S. at 530.  She cites no evidence of record from the relevant time period other than her testimony.  (Doc. 5 at 10-11).  Medical evidence is necessary to establish that an impairment meets or equals a listing.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 12.00(B) (specifying the need for medical evidence in order to establish the existence of a medically determinable impairment(s) of the required duration by medical evidence consisting of symptoms, signs, and laboratory findings); *Id.*(D) (calling for documentation).

The plaintiff contends that the ALJ placed too much emphasis upon her drug abuse.  (Doc. 5 at 11).  In her brief, the plaintiff asserts that there is "no evidence to support a continuation of drug abuse."  *Id.*  Yet Dr. Mulloth stopped writing prescriptions for Oxycontin and terminated his treating relationship with the plaintiff as recently as July 2005, after the plaintiff tested positive for morphine, which Dr. Mulloth attributed to possible heroin use.  (Tr. 375-76).  The plaintiff

19

testified that the morphine found in her urine was not heroin,
and that she had only ever used heroin once, in May 2002. (Tr.
34-35). The plaintiff's May 2002 prison intake records, however,
indicate that she had track marks on both arms and that she
admitted to using heroin three times per week. (Tr. 230, 272).
Moreover, the plaintiff's testimony that she had never used
heroin and tried it only to commit suicide in May 2002
contradicts what she told the physicians who attended to her at
the time, namely, that she had a longstanding history of drug
abuse and had overdosed accidentally. (Tr. 34-35, 198). Such
inconsistencies, along with the plaintiff's lie to Dr. Mulloth
regarding her incarceration, factored into the ALJ's credibility
finding. (Tr. 18-19; Doc. 5 at 11). For the ALJ to have
considered drug use and the claimant's accounts of her drug use
in connection with evaluating her credibility was an appropriate
exercise of fact finding responsibility.

------

 C. Whether the ALJ erred in finding a residual functional
capacity for full range of light work.

 The plaintiff also contends that the ALJ erred in finding
that she could make an adjustment to other work in the national
economy. Specifically, the plaintiff argues that the ALJ erred
in rejecting the testimony of the vocational expert, who opined,

based on a hypothetical question assuming a residual functional capacity for a limited range of light work, that there were no jobs which the plaintiff could perform.  (Doc. 5 at 12-13).

The hypothetical question described a person of the plaintiff's age, education and vocational background who could perform light work, but who was, because of concentration and memory problems, reduced to simple, repetitive tasks and no dealing with the general public.  (Tr. 41).  This hypothetical question did not reflect the ALJ's residual functional capacity finding; the ALJ ultimately determined that the plaintiff has the residual functional capacity to perform a full range of unskilled light work.  (Tr.16).

The ALJ determined that the plaintiff met all of the exertional demands of light work and had no additional nonexertional limitations.  The ALJ chose to apply the Medical-Vocational Rules rather than use the testimony of the vocational expert.  (Tr. 19).  *See* Social Security Ruling 83-11 (explaining that when a claimant can perform all or substantially all of the exertional demands at a given exertional level and does not have additional nonexertional limitations, use of the Medical-

21

Vocational Guidelines is appropriate). If substantial evidence supports the ALJ's finding that the plaintiff had no nonexertional limitations, the ALJ's application of Medical-Vocational Rule 202.21 was appropriate. (Tr. 19-20). *Sykes v. Apfel*, 228 F.3d 259, 270 (3d. Cir. 2000). The plaintiff contends, however, that the limitation the ALJ included in the hypothetical to the vocational expert, poor concentration, is an additional nonexertional limitation on her residual functional capacity. (Doc. 5 at 13).

Although the plaintiff's concentration problems may not reduce her work ability to the level the ALJ suggested to the vocational expert, rendering her capable of only simple, repetitive tasks involving no interaction with the general public, substantial evidence does not apparently support the ALJ's determination that the plaintiff had no nonexertional limitation in this area. The plaintiff alleged trouble concentrating in her disability paperwork and told Dr. Nourian that she was unable to concentrate. (Tr. 100, 344). Dr. Nourian reported that the plaintiff's concentration, upon mental status examination, was only fair. (Tr. 345). Dr. Grutkowski, the state agency psychologist who reviewed the plaintiff's medical

records, concluded that she was moderately limited in her ability
to maintain concentration, persistence or pace.  (Tr. 354-67).

At step three of the sequential evaluation the ALJ had
determined that the plaintiff had moderate difficulties in
concentration, persistence, and pace.  (Tr. 16).  Yet the ALJ's
residual functional capacity finding included no related
nonexertional limitations.  (Tr. 19).  No explanation for this
inconsistency can be found in the ALJ's opinion.  (Tr. 19-20).
The ALJ also does not explain her reason for rejecting the
vocational expert's testimony.  Thus, we cannot determine that
substantial evidence supports the ALJ's finding that the
plaintiff had no nonexertional limitations.  Accordingly, the ALJ
erred in relying on Medical-Vocational Rule 202.21.

**V.   Conclusion**

On the basis of the foregoing, it is recommended that the
appeal of the plaintiff be granted and the case remanded for
further proceedings and consideration consistent with this
report.

*/s/ J. Andrew Smyser*
J. Andrew Smyser
Magistrate Judge

Dated:   August 28, 2006.